{¶ 17} Because I believe the magistrate correctly resolved the pertinent issues, I respectfully dissent.
{¶ 18} Apparently, the emergency walkway installed by W-P Steel was installed as the result of a previous crane incident when the operator was trapped in the crane with serious consequences. When W-P Steel provided an egress from the crane, the walkway was unguarded. After Joseph Fadeley fell to his death, W-P Steel realized that some guarding was feasible without completely undermining the purpose of the walkway. Specifically, the walkway could have gates or openings on the side so an operator could get on the walkway at reasonable intervals, but still would have protection from falling.
{¶ 19} W-P Steel argues that, because it later installed a "reasonable compromise" of guarding on the walkway, it somehow was relieved of the necessity of guarding the walkway at the time of Mr. Fadeley's fall. This argument has no merit. The Ohio Administrative Code is clear in its requirements for guarding and allows an exception only "where operating conditions necessitated such omission." W-P Steel had the obligation to demonstrate that operating conditions necessitated omission of guarding. W-P Steel did not so demonstrate, either before the commission or before us.
{¶ 20} I believe W-P Steel did not show an entitlement to a writ of mandamus. I would overrule the objections to the magistrate's decision and deny the request for a writ of mandamus. Since the majority does not, I respectfully dissent.
 APPENDIX A IN MANDAMUS
{¶ 21} In this original action, relator, Wheeling-Pittsburgh Steel Corporation, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting an additional award for a violation of a specific safety requirement ("VSSR"), and to enter an order denying the VSSR award.
Findings of Fact:
{¶ 22} 1. On June 20, 1999, Joseph W. Fadeley ("decedent") fell to his death from a special purpose runway while he was employed by relator as an overhead crane operator. The fatal accident occurred inside relator's steel mill known as the Steubenville South Plant.
{¶ 23} 2. Subsequently, decedent's surviving spouse, Kimberly Fadeley ("claimant") filed a death claim which the commission allowed. The claim was assigned No. 99-439655.
{¶ 24} 3. On December 16, 1999, claimant filed a VSSR application alleging that relator had violated Ohio Adm. Code 4121:1-5-02(D)(1)(a) and that the violation caused decedent's death.
{¶ 25} 4. The VSSR application prompted the Ohio Bureau of Workers' Compensation ("bureau") to conduct an investigation into the industrial accident. On or about March 31, 2000, the bureau's special investigator filed a written report.
{¶ 26} 5. On April 9, 2001, the VSSR application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record. Thereafter, the SHO issued an order granting the VSSR application. The SHO's order of April 9, 2001 states:
 It is the order of the Staff Hearing Officer that the deceased was employed on the date of injury noted above, by the employer as an overhead crane operator; that the deceased sustained a fatal injury in the course of and arising out of employment when he fell approximately 80 feet from an overhead walkway into a pit below.
 It is further the finding of the Staff Hearing Officer that the deceased's injury was the result of the employer's failure to guard the overhead walkway as required by 4121:1-5-02(D), the Code of Specific Requirements of the Industrial Commission relating to the guarding of overhead walkways.
 The Staff Hearing Officer notes at the outset that the immediate facts and circumstances surrounding the deceased's fatal accident are not known. What is known is that on the date of the accident, the deceased was working as an overhead crane operator at the employer's Steubenville South Plant steel mill. Statements on file from co-workers indicate that they had seen the deceased throughout that particular shift and that he had seemed fine to them. Mr. Afek's statement indicates that not long before the accident, the deceased had indicated that the air conditioning unit in the crane he was operating, crane #268, was not functioning. Just prior to the accident, according to Mr. Manist's statement on file, crane #268 was observed to leave its position over the south ladle where hot metal was being poured and travel north; presumably, the deceased was moving the crane to escape the smoke and sparks that were rising from the pour. Later, when Mr. Manist called over the speaker in the plant and gave the signal indicating that there was work for crane #268 to perform, there was no response from or movement of the crane. Investigation by co-workers revealed that the deceased was lying in a ladle approximately 80 feet below the emergency walkway that runs parallel to the operating path of the crane, having sustained the fatal injury. There were no witnesses to the deceased's fall, and as such, it is not clear what his precise location was prior to the fall. The employers' investigation report regarding the accident indicates that it is likely that the deceased had exited the cab of crane #268 and had fallen from the emergency walkway.
 On her IC-9 Application, the widow-claimant (hereinafter "claimant") alleged a violation of Ohio Administrative Code (hereinafter "OAC") 4121:1-5-02(D)(1)(a) and (E) pertaining respectively to the guarding of elevated platforms, runways, and walkways and the requirements for standard guard railings and toeboards.
 There is no dispute that the overhead emergency walkway involved in the accident falls under the scope of OAC 4121:1-5-02(D). It is also undisputed that at the time of the deceased's injury, the walkway was not guarded with standard railings or toeboards. As such, the focus shifts to the applicability and interpretation of OAC 4121:1-5-02(D)(4), which states as follows:
"Special purpose runways.
 Runways used exclusively for special purposes, such as oiling, shafting, or filling tank cars, may have the railing on one side omitted where operating conditions necessitate such omission, provided the falling hazard is minimized by using a runway of not less than eighteen inches wide."
 The employer contended at hearing that the walkway from which the deceased apparently fell was such a special purpose runway. That special purpose, and the sole purpose of the walkway according to the employer, is to provide a means of escape for a crane operator in case of an emergency. There are certain boarding areas where crane operators routinely enter and exit the cranes, with such areas being properly guarded. However, a prior incident wherein a crane operator had been killed for lack of means to escape the crane in an emergency when the crane was not positioned at one of the normal boarding areas had prompted the employer to install the emergency walkway. The employer further contended that the "operating conditions," as that term is used in sub-paragraph (4) quoted above and which necessitated that the emergency walkway not have any railing on the open side, was to provide the means to allow the crane operator to exit the crane in the event of an emergency. In addition, the employer indicated at hearing that the walkway is more than eighteen inches wide. Accordingly, the employer contended that it had met the two requirements of sub-paragraph (4), i.e., the walkway was a special purpose walkway, and operating conditions necessitated that it not have railing on one side. As such, the employer contended that there was no violation of the guarding requirement set forth in OAC 4121:1-5-02(D)(1) involved in the deceased's fatal injury.
 The claimant first contended at hearing that the emergency walkway from which the deceased had fallen was not a special purpose walkway. Citing the co-worker statements included in the employer's investigation report, the claimant contended that crane operators used the emergency walkway for purposes other than exiting the crane in the event of an emergency, such as to walk to a window for fresh air during periods of down-time. In addition, the claimant contended that because the employer's safety policy regarding the operation of the overhead cranes did not define the term "emergency," it is entirely possible that immediately prior to his accident, the deceased felt that emergency conditions existed, i.e., excessive heat in the crane cab, which justified his use of the emergency walkway. Finally, the claimant contended that there were no "operating conditions" prior to the deceased's fall that required the omission of a railing on the open side of the walkway, pointing to the fact that subsequent to the deceased's accident, the employer installed a guard system for the emergency walkway consisting of a railing connecting a series of gates.
 The Staff Hearing Officer makes the following findings regarding these contentions, based on the weight of the evidence on file and presented at hearing. First, the Staff Hearing Officer finds that the weight of the evidence indicates that the deceased fell from the emergency walkway. This finding is based on the employer's accident investigation report, which so indicates. Second, the Staff Hearing Officer finds that the walkway was in fact a "special purpose" walkway, as that term is used in OAC 4121:1-5-02(D)(4), based on the circumstances that had led to its installation in the first place, as discussed above, and the lack of persuasive evidence to the contrary. The record does not persuasively demonstrate that the walkway was used for any purpose other than as a means of egress from the crane in emergency situations. In addition, the reasons and circumstances that led to the deceased being on the walkway immediately prior to his fall are matters of speculation. Third, the Staff Hearing Officer finds that the weight of the evidence does not support the employer's contention that operating conditions necessitated the omission of any railing on the open side of the emergency walkway. The Staff Hearing Officer bases this finding on the fact that subsequent to the deceased's fall, the employer installed a guarding system consisting of a railing connected to a series of gates along the walkway. As a result, the crane continues to perform its regular function, there is an emergency walkway to provide means of egress from the crane in case of emergency, and that walkway is now guarded. The Staff Hearing Officer acknowledges the employer's concern, expressed at hearing, that the railing/gate system may inhibit the ability of a crane operator to escape from the crane in case of an emergency in the crane itself. However, the current system presents a reasonable compromise between separate interests; there is a means of escape from the crane in the event of an emergency, with the single railing not providing a total restriction on the operator's ability to get to the emergency walkway, yet the walkway itself is guarded in a meaningful way. Such a scenario is consistent with the provisions of OAC 4121:1-5-02(D)(1)(b), which indicate that means of guarding a walkway other than those set forth in sub-paragraph (D)(1)(a) may be appropriate under certain circumstances.
 Accordingly, the Staff Hearing Officer finds that because operating conditions at the time of the deceased's accident did not require that a railing be omitted from the open side, the exception provided in sub-paragraph (4) to the walkway guarding requirement set forth in sub-paragraph (1) of OAC 4121:1-5-02(D) is not applicable to the facts of this case. As such, the Staff Hearing Officer finds that the employer was in violation of the walkway guarding requirements set forth in OAC 4121:1-5-02(D)(1).
 In addition, the Staff Hearing Officer finds that the violation identified above was a proximate cause of the deceased's fatal injury, in that had the emergency walkway been guarded at the time of the accident in the manner in which it is now guarded, it is likely that the accident could have been prevented. The Staff Hearing Officer bases this finding on the testimony at hearing of Mr. Ensell, the employer's Manager of Corporate Safety. Mr. Ensell testified that the deceased probably would not have fallen had the walkway been guarded then as it is now, adding that the railing currently in place would have provided the deceased with some safety against falling (pp. 28-29 of the transcript).
 It is therefore ordered that an additional award of compensation be granted to the claimant in the amount of 20 percent of the maximum weekly rate under the rule of "STATE EX REL. ENGLE V. INDUSTRIAL COMMISSION" 142 OHIO ST. 425.
 It is further the finding of the Industrial Commission that no order requiring a correction of the violation(s) found herein is appropriate for the reason: the violation no longer exists.
{¶ 27} 6. Relator moved for rehearing pursuant to Ohio Adm. Code4121-3-20(G).
{¶ 28} 7. On August 22, 2001, another SHO mailed an order denying relator's motion for rehearing. The order states:
 * * * The Employer has not submitted any new and relevant evidence nor shown that the order of 04/09/2001 was based on an obvious mistake of fact or on a clear mistake of law.
 It is noted that this is a difficult case to evaluate, in that the claimant died in the accident herein, and no one saw him fall. However, the Staff Hearing Officer, in his order of 04/09/2001, has cited the evidence relied on for his factual findings and his legal conclusions have not been shown to have been based on a "clear mistake of law." Counsel for the employer contends that the Staff Hearing Officer improperly considered "subsequent remedial measures" in finding a violation. However, a close reading of the Staff Hearing Officer order shows that he used the presence of the "railing/gate system" as the basis to find that the special purposes runway exception did not apply herein, not as proof that OAC 4121:1-5-02(D)(1) had been violated.
 As the requirements of OAC 4121-3-20(C)(1)(a) or (b) have not been met, the employer's request for a VSSR rehearing must be denied. [Emphasis sic.]
{¶ 29} 8. On November 9, 2001, relator, Wheeling-Pittsburgh Steel Corporation, filed this mandamus action.
Conclusions of Law:
{¶ 30} Several issues are presented: (1) whether the subsequent remedial measure constitutes some evidence upon which the commission can rely to support a finding that the "special purpose" exception to Ohio Adm. Code 4121:1-5-02(D)(1)(a)'s guarding requirement did not apply to permit relator to omit the railing on one side of the runway, (2) whether it was an abuse of discretion for the commission to find that the subsequent remedial measure "is consistent with" Ohio Adm. Code4121:1-5-02(D)(1)(b)'s "alternative protection" provision, and thus, the subsequent remedial measure presents a "reasonable compromise between separate interests," (3) whether the commission's refusal to apply the "special purpose" exception was based solely, as relator contends here, upon the commission's determination that the subsequent remedial measure did not interfere with the crane's "regular function," and (4) whether the commission abused its discretion in failing to find that it was the decedent's alleged unilateral negligence that was the proximate cause of his death.
{¶ 31} The magistrate finds: (1) the subsequent remedial measure does constitute some evidence upon which the commission can and did rely to support its finding that the "special purpose" exception did not permit relator to omit the railing on one side of the runway, (2) it was not an abuse of discretion for the commission to find that the subsequent remedial measure is consistent with Ohio Adm. Code 4121:1-5-02(D)(1)(b)'s "alternative protection" provision and, thus, the subsequent remedial measure presents a "reasonable compromise between separate interests," (3) the commission's refusal to apply the "special purpose" exception was not based solely, as relator contends here, upon the commission's determination that the subsequent remedial measure did not interfere with the crane's "regular function," and (4) the commission did not abuse its discretion in failing to find that decedent was unilaterally negligent and that such negligence was the proximate cause of his death.
{¶ 32} Accordingly, as more fully explained below, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
{¶ 33} Ohio Administrative Code Chapter 4121:1-5 sets forth specific safety requirements for workshops and factories. Ohio Adm. Code4121:1-5-01(B) sets forth the following definitions:
 (131) "Standard guard railing": a substantial barrier, constructed in accordance with paragraph (E) of rule 4121:1-5-02 of the Administrative Code.
 (a) "Top rail": the top lateral member of a standard guard railing.
 (b) "Intermediate rail": the lateral member or members of a standard guard railing, installed at intervals of no more than twenty-one inches.
* * *
 (139) "Toeboard": a vertical barrier erected along exposed edges of a floor opening, platform, runway, ramp, or scaffold to prevent falls of material.
{¶ 34} Ohio Adm. Code 4121:1-5-02 states in part:
(D) Elevated platforms, runways and walkways.
This rule does not apply to scaffolding.
(1)Guarding.
 (a) Elevated platforms, runways and walkways six feet or more above floor or ground level shall be guarded with standard railings and toeboards. All elevated runways, platforms and walkways, regardless of height, located over or adjacent to water, machinery, open vats, open soaking pits or open tanks shall be provided with standard railing and toeboards.
 (b) When the requirement prescribed above would result in an impairment of the work being performed, alternative protection may be provided for employees. Such alternative protection shall provide safety equivalent to or greater than that required in paragraph (D)(1)(a) of this rule.
* * *
(4) Special purpose runways.
 Runways used exclusively for special purposes, such as oiling, shafting, or filling tank cars, may have the railing on one side, omitted where operating conditions necessitate such omission, provided the falling hazard is minimized by using a runway of not less than eighteen inches wide.
 (E) Standard guard railings, intermediate rail and toeboards.
 A standard guard railing shall be constructed as a substantial barrier, securely fastened in place, and free from protruding objects, such as nails, screws and bolts, to protect openings or prevent accidental contact with some object, which barrier shall consist of a top rail not less than forty-two inches above the working level, and unless the space between the top rail and the working level is covered with substantial material, an intermediate rail. * * *
{¶ 35} Turning to the first issue, Evid.R. 407 states:
 When, after an injury or harm allegedly caused by an event, measures are taken which, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.
{¶ 36} In State ex rel. Buckeye Steel Castings v. Indus. Comm. (1986), Franklin App. No. 85AP-900, a case cited by relator, this court remanded the case to the trial court for the issuance of a writ of mandamus ordering the commission to vacate its VSSR award. Apparently, the employer had argued that the evidence of a subsequent remedial measure could not be considered by the commission under Evid.R. 407.
{¶ 37} In Buckeye Steel Castings, the claimant slipped and fell while standing on a piece of equipment known as a weld positioner. The commission determined that Ohio Adm. Code 4121:1-5-02(D) was violated. The issue before this court was whether the beam upon which the claimant was standing was an elevated platform requiring standard railings and toeboards. This court found that the commission had abused its discretion in finding that the beam was a platform.
{¶ 38} In Buckeye Steel Castings, there was evidence that, after the injury, the employer had made modifications to the equipment where claimant fell.
{¶ 39} After noting that Evid.R. 407 is inapplicable to commission proceedings because of R.C. 4123.10, this court wrote:
 * * * However, this evidence of a subsequent remedial measure is not some evidence that Ohio Adm. Code 4121:1-5-02(D) was violated. An employer may provide additional safety precautions which are not specifically required by the Industrial Commission. Obviously, the employer is interested in protecting his employees from injury where a need appears, even in the absence of a specific safety requirement. This evidence demonstrates that it is possible to make the area safer, but it does not prove that a safety regulation was violated.
{¶ 40} In this action, citing Buckeye Steel Castings, relator asserts that a subsequent remedial measure can never serve as some evidence supporting a VSSR award. (Relator's brief at p. 10.)
{¶ 41} Relator misconstrues Buckeye Steel Castings. That case does not stand for the proposition that a subsequent remedial measure can never serve as some evidence supporting a VSSR award.
{¶ 42} Moreover, even if Evid.R. 407 were applicable to commission proceedings, Evid.R. 407 would not bar use of the subsequent remedial measure to show or prove the feasibility of the measure prior to decedent's accidental death.
{¶ 43} In short, the subsequent remedial measure does constitute some evidence here upon which the commission can and did rely to support its finding that the "special purpose" exception did not apply to permit relator to omit the railing on one side of the runway.
{¶ 44} Turning to the second issue, Ohio Adm. Code4121:1-5-02(D)(1)(b) permits the employer to provide "alternative protection" when implementation of Ohio Adm. Code 4121:1-5-02(D)(1)(a)'s standard railings and toeboards would result in "an impairment of the work being performed." Here, the commission found that the subsequent remedial measure a railing connected to a series of gates along the walkway "is consistent with" Ohio Adm. Code 4121:1-5-02(D)(1)(b)'s "alternative protection" rule.
{¶ 45} However, according to relator, Ohio Adm. Code4121:1-5-02(D)(1)(b) is inapplicable, by its very terms, because the commission found that the walkway at issue was used only as a means of egress from the crane in emergency situations and, thus, the commission allegedly found that no "work" was being performed on the walkway. (Relator's brief at pg. 9). Apparently, relator would argue, if no "work" was performed on the emergency runway, then it cannot be said that the standard railings and toeboards would result in "an impairment of the work being performed."
{¶ 46} Relator too narrowly construes Ohio Adm. Code4121:1-5-02(D)(1)(b)'s phrase "work being performed" to suit its own purposes here. Relator would have the commission and this court find that "work being performed" only occurs when a craneman occupies the crane.
{¶ 47} What relator seeks to do by its narrow construction of the phrase "work being performed" is to eliminate Ohio Adm. Code4121:1-5-02(D)(1)(b)'s "alternative protection" provision as a viable option for it prior to the accidental death. Relator would have the commission and this court find that Ohio Adm. Code 4121:1-5-02(D)(1)(b)'s "alternative protection" provision was not available to it prior to the injury because somehow it allegedly could not be said that a standard railing and toeboard would result in an impairment of the work being performed.
{¶ 48} If a standard railing would have prevented the craneman's egress from the crane in an emergency situation, such a scenario would indeed be an impairment of the work being performed at the steel mill. Clearly, any death or serious injury at a worksite impairs the work being performed.
{¶ 49} Here, relator additionally argues that the commission, in finding that the subsequent remedial measure presents a "reasonable compromise between separate interests," in effect established a "reasonable compromise" standard without promulgation of such standard. (Relator's brief at p. 9).
{¶ 50} Clearly, Ohio Adm. Code 4121:1-5-02(D)(1)(b)'s "alternative protection" provision can be read to permit the reasonable compromise that the commission found was achieved by relator's subsequent remedial measure. No unpromulgated standard was relied upon, contrary to relator's contention herein.
{¶ 51} In short, the commission did not abuse its discretion in finding that the subsequent remedial measure is consistent with Ohio Adm. Code 4121:1-5-02(D)(1)(b)'s "alternative protection" provision and in finding that the subsequent remedial measure presents a "reasonable compromise between separate interests."
{¶ 52} The third issue presents itself in relator's brief as follows:
 The Commission expressly found that "the walkway was in fact a `special purpose' walkway, as that term is used in OAC 4121:1-5-02(D)(4), based on the circumstances that led to its installation in the first place * * * and the lack of persuasive evidence to the contrary." [R. 89.] However, the Commission refused to apply the "special purpose" exception because, in its opinion, "operating conditions" did not necessitate omission of guarding based solely on the fact that the subsequently installed non-standard railing/gate system did not interfere with the crane's "regular function." [Id.] This was error. [Relator's brief at p. 7.]
{¶ 53} The quoted phrase "regular function" is found in the context of the following portion of the commission's order:
 * * * Third, the Staff Hearing Officer finds that the weight of the evidence does not support the employer's contention that operating conditions necessitated the omission of any railing on the open side of the emergency walkway. The Staff Hearing Officer bases this finding on the fact that subsequent to the deceased's fall, the employer installed a guarding system consisting of a railing connected to a series of gates along the walkway. As a result, the crane continues to perform its regular function, there is an emergency walkway to provide means of egress from the crane in case of emergency, and that walkway is now guarded. The Staff Hearing Officer acknowledges the employer's concern, expressed at hearing, that the railing/gate system may inhibit the ability of a crane operator to escape from the crane in case of an emergency in the crane itself. However, the current system presents a reasonable compromise between separate interests; there is a means of escape from the crane in the event of an emergency, with the single railing not providing a total restriction on the operator's ability to get to the emergency walkway, yet the walkway itself is guarded in a meaningful way. Such a scenario is consistent with the provisions of OAC 4121:1-5-02(D)(1)(b), which indicate that means of guarding a walkway other than those set forth in sub-paragraph (D)(1)(a) may be appropriate under certain circumstances. [Emphasis added.]
{¶ 54} Clearly, relator is incorrect in asserting as fact that the commission refused to apply the "special purpose" exception based solely on the fact that the subsequent remedial measure did not interfere with the crane's "regular function."
{¶ 55} As the commission's order makes clear, the commission refused to apply the "special purpose" exception set forth at Ohio Adm. Code 4121:1-5-02(D)(4) because it found that the subsequent remedial measure would have met Ohio Adm. Code 4121:1-5-02(D)(1)(b)'s "alternative protection" provision had relator undertaken the remedial measure prior to the accidental death of decedent.
{¶ 56} Contrary to relator's position here, the compliance of its remedial measure with Ohio Adm. Code 4121:1-5-02(D)(1)(b) "alternative protection" provision is proof that "operating conditions" did not necessitate the omission of railing on one side of the special purpose runway.
{¶ 57} Turning to the fourth issue, in State ex rel. Quality Tower Serv. Inc. v. Indus. Comm. (2000), 88 Ohio St.3d 190, the court succinctly summarized the case law that has developed on "unilateral negligence" an employer's defense to VSSR liability. The court wrote:
 * * * Unilateral negligence derives from State ex rel. Frank Brown Sons, Inc. v. Indus. Comm. (1988), 37 Ohio St.3d 162, 524 N.E.2d 482, in which an employer was exonerated from VSSR liability because an employee had removed a part of a scaffold that had been required by a specific safety requirement. Brown held that (1) employers can be subject to VSSR penalties for "only those acts within the employer's control," and (2) a specific safety requirement does not impose a duty of "constant surveillance" just by requiring a securely and rigidly based scaffold. Id. at 164, 524 N.E.2d at 485.
 * * * In [State ex rel. Cotterman v. St. Marys Foundry (1989), 46 Ohio St.3d 42, 544 N.E.2d 887], an employer was held liable for violating a regulation requiring sufficient chain-sling capacity for suspending overhead loads. There, a supervisory employee was killed because he selected chains too weak to suspend a huge core. Contrasting Brown, the Cotterman court held, in effect, that this specific safety requirement imposed an absolute duty of compliance notwithstanding the supervisory employee's mistake.
 Brown and Cotterman are regularly cited for establishing the boundaries of the unilateral negligence defense. [Citations omitted.] [H]owever, the defense is not actually about an employee's negligence. The employer instead avoids VSSR liability when "[the] employee unilaterally violates a safety requirement [emphasis added]," [Citations omitted.] That is, when the employee removes or ignores equipment or instruction that complies with a specific safety requirement. [Citations omitted.] On the other hand, an employee's negligence in failing to protect himself from injury due to an employer's VSSR will never bar recovery because specific safety requirements exist to promote a safe work environment and "to protect employees against their own negligence and folly." [Citations omitted.] Thus, the critical issue in a VSSR claim is always whether the employer complied with the specific safety requirement. Id. [Emphasis sic.]
{¶ 58} In support of its unilateral negligence argument, relator points to its General Safety Regulations which provide in part:
3. Boarding and Leaving Cranes:
 3.1 Cranemen boarding and leaving cranes shall do so at the authorized locations utilizing the regular prescribed stairways, ladders, and approach.
* * *
 3.3 Cranemen required to board or leave a crane that cannot be positioned at the authorized location, must (except in emergencies) contact the Supervisor in charge of that crane, who will be responsible for setting up the safe boarding and leaving procedure in each instance. Extreme safety precaution must be taken in such case.
* * *
 3.5 Cranemen shall not walk crane runways to board or leave cranes. Exception: During breakdowns when crane cannot be moved or during emergency situations when walking the runway is the best way to leave. * * *
{¶ 59} The commission's order states in part:
 * * * Just prior to the accident, according to Mr. Manist's statement on file, crane #268 was observed to leave its position over the south ladle where hot metal was being poured and travel north; presumably, the deceased was moving the crane to escape the smoke and sparks that were rising from the pour.
 * * * There are certain boarding areas where crane operators routinely enter and exit the cranes, with such areas being properly guarded. * * *
 * * * [T]he reasons and circumstances that led to the deceased being on the walkway immediately prior to his fall are matters of speculation. * * *
{¶ 60} Based upon its general safety regulations and the commission's order aforementioned, relator posits the following argument:
 * * * Accordingly, the Commission found that: Wheeling-Pitt provided authorized locations for boarding and exiting the crane which were properly guarded; immediately prior to Decedent's accident, crane #268 was operable; and, the evidence was not sufficient to support a finding that Decedent was required to exit onto the walkway because of an emergency situation. The only conclusion that is supported by this evidence is that Decedent's use of the emergency walkway at the time of his accident was contrary to the safety directive of his employer. As such, it was Decedent's unauthorized and unilateral act, and not Wheeling-Pitt's failure to erect some form of guarding, that was the proximate cause of his fall. [Relator's brief at pg. 12.]
{¶ 61} Even if it is assumed for the sake of argument that decedent's use of the walkway immediately prior to his fatal fall was contrary to the safety directive of his employer, there is no unilateral negligence here to exonerate relator from the VSSR award. The special purpose walkway was not in compliance with Ohio Adm. Code4121:1-5-02(D)(1)(a) as the commission found. Even if decedent had been advised of his employer's written safety rules regarding egress from the crane, any alleged negligence on decedent's part is not unilateral negligence. Quality Tire Serv., Inc. v. Indus. Comm. (2000),88 Ohio St.3d 190.
{¶ 62} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.